IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| BRENDA G. CROUSE, | § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 7:05-CV-113-R (BH) |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | § § § § | |
| Defendant. | § | Referred Motion |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and an Order of the Court in implementation thereof, this cause has been referred to the United States Magistrate Judge. Before this Court are *Plaintiff's Brief*, *Defendant's Brief*, and *Plaintiff's Reply Brief*, all filed on May 1, 2006. Having reviewed the record before the Court, the undersigned recommends that the decision of the Commissioner be wholly **AFFIRMED**.

### I. BACKGROUND[1]

**A.** **Procedural History**

This is an appeal of Defendant Commissioner of the Social Security Administration's ("Commissioner") determination that Plaintiff Brenda Crouse ("Plaintiff") is not entitled to disability benefits under Title II of the Social Security Act ("Act"). Plaintiff initially filed her application for disability benefits on March 19, 2002. (Tr. at 45–48). Plaintiff claimed she was disabled due to an

---

[1] The following background facts come from the transcript of the administrative proceedings, which is designated as "Tr."

1

artificial right leg, abdominal hernia, obesity, and folliculitis. (Tr. at 74–75). Plaintiff's application was denied on initial review and on reconsideration. (Tr. at 20–21). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 221–49). A hearing, at which Plaintiff personally appeared and testified, was held October 23, 2003. *Id.* On January 26, 2005, the ALJ issued a decision denying benefits and finding Plaintiff capable of performing sedentary work. (Tr. at 8–19). The Appeals Council denied Plaintiff's request for review. (Tr. at 3–6). Plaintiff then brought this timely appeal to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.     Factual History**

    1.     Age, Work Experience, & Education

Plaintiff was born June 22, 1963. (Tr. at 47, 228). She completed high school and a vocational course in tractor-trailer driving. (Tr. at 81). Her past relevant work includes employment as a farm and dairy worker, tractor driver, and housekeeper. (Tr. at 76).

    2.     Medical Evidence

When Plaintiff was four years old, complications arising from a snake bite to her right ankle resulted in the amputation of her right leg below the knee. (Tr. at 232).

The first medical record relevant to Plaintiff's application for disability benefits was on March 10, 1998. (Tr. at 151). On this date, Plaintiff reported to Dr. Robert McBroom, M.D., that following a hemorrhoidectomy in 1996, she suffered from recurrent *Staphylococcus* infections. *Id.* Her chief complaint on March 10, 1998, was a "diffuse red rash" found on her truncal regions as well as the inguinal regions of her thighs. *Id.* During his physical examination, Dr. McBroom noted that Plaintiff's amputated leg had a "fairly well-healed stump with no obvious breakdown or infection." (Tr. at 152). Although Dr. McBroom identified excessive callousing at the bottom of

2

the stump, he did not consider this to be a serious problem. *Id.* Furthermore, he diagnosed her with a skin rash of unknown origin and suspected "hot tub" folliculitis or moniliasis.[2] *Id.*

Dr. McBroom examined Plaintiff again on April 16, 1998. (Tr. at 149). Dr. McBroom reported that although the Staph lesions between Plaintiff's breasts drained occasionally, the diffuse red rash observed on her truncal and inguinal regions had resolved. *Id.* Dr. McBroom also noted that his examination of Plaintiff's medical records and her positive cultures for *Pseudomonas* led him to believe that her rash was most likely "hot tub" folliculitis. *Id.*

In a progress note dated January 25, 1999, Dr. McBroom reported that Plaintiff had numerous skin problems at the amputation site. (Tr. at 148). According to the report, the skin surrounding the incisions and the stump appeared thickened and slightly red due to capillary congestion; however Dr. McBroom could not ascertain any evidence of infection. *Id.* Dr. McBroom also noted that Plaintiff removed her prosthesis to let the extremity air-dry several times during the day. Dr. McBroom recommended that she clean the prosthesis two times a day and use neutral powders to control perspiration. *Id.* At a February 9, 1999 examination, Dr. McBroom reported that the condition of Plaintiff's leg appeared unchanged. (Tr. at 147). At this time, Dr. McBroom recommended what he termed a "middle ground" treatment of baby oil and baby lotion at the amputation site, as the powder treatment caused drying, cracking and irritation of the wound. *Id.*

---

[2]Hot tub folliculitis is an infection of the hair follicles that results from exposure to certain bacteria that live in warm, wet areas. Most folliculitis is caused by the common organism *Staphylococcus aureus*. However, hot tub folliculitis is caused by *Pseudomonas aeruginosa*. Kevin Berman, *Hot Tub Folliculitis*, MEDICAL ENCYCLOPEDIA ONLINE, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/001460.htm (last visited Aug. 28, 2007). Moniliasis, also called candidiasis, is an infectious disease produced by a yeast-like fungus. *Candidiasis*, ENCYCLOPEDIA BRITANNICA ONLINE, *available at* http://www.britannica.com/eb/article-9019955/candidiasis (last visited Aug. 28, 2007).

In notes of a subsequent visit on March 23, 1999, Dr. McBroom indicated that the lesions on Plaintiff's amputation had improved. (Tr. at 146). Dr. McBroom also noted that Plaintiff had allowed the wounds to heal by refraining from the use of her prosthesis, which was poorly–fitting. *Id.* Dr. McBroom advised Plaintiff to continue on this course—refraining from bearing weight on the amputated leg, avoiding the prosthesis, and using crutches to walk. *Id.* According to Dr. McBroom, Plaintiff also reported that she had undergone a drainage procedure for some of the lesions on her stump; however he was unaware of the nature of this procedure. *Id.*

Dr. McBroom did not see Plaintiff again until September 30, 1999. (Tr. at 145). On this date, Dr. McBroom recorded that Plaintiff continued to experience skin infections located bilaterally on her arms and in the inner regions of her thighs and groin. *Id.* Dr. McBroom also noted that the "problem with the amputation site appears to be completely resolved." *Id.* Moreover, Dr. McBroom reported that Plaintiff had received a new prosthesis since her last visit. *Id.* Subsequently, in an October 5, 2000 report, Dr. McBroom noted that Plaintiff's inter-regionis folliculitis continued to disturb her. (Tr. at 144). However, when Dr. McBroom examined Plaintiff, he found what he termed "old but relatively recent folliculitis" only in her left armpit. *Id.*

On February 7, 2001, Dr. McBroom found Plaintiff's progress to be unchanged since her last visit. (Tr. at 142). Plaintiff still displayed skin problems under her left arm, in the inter-regiones areas, and on her breasts. *Id.* Dr. McBroom also noted that the problems Plaintiff had been having with her stump were resolved when she received a new prosthesis. *Id.* In addition, on June 7, 2001, Dr. McBroom reported that Plaintiff had been "doing very well as far as the skin condition is concerned." (Tr. at 140). Dr. McBroom reported only one minor occurrence of the folliculitis in the past four months and noted that Plaintiff could discontinue the Bactrim she had been taking to

4

treat the condition. *Id.*

On February 21, 2001, Plaintiff presented herself to Dr. Frederick Langner, M.D., complaining of a painful bulge on her abdomen. (Tr. at 135). Dr. Langner diagnosed the bulge as a ventral hernia and recommended repair. *Id.* At the time of the examination, Dr. Langner reported that Plaintiff's folliculitis in her left armpit was under control. *Id.* Dr. Langner also observed that Plaintiff was an obese woman, but found her to be in no acute distress. *Id.* On March 5, 2001, Plaintiff underwent a ventral and umbilical hernia repair. (Tr. at 129).

Plaintiff reported to Dr. Donald H. John, M.D., on April 10, 2001, for a neurological evaluation. (Tr. at 116). Plaintiff's chief complaint at the time of this examination was pain in her left leg over a two week period. *Id.* Dr. John described Plaintiff's past medical history as unremarkable, noting that she was a well-nourished, well-developed white female displaying no acute distress. *Id.* Upon neurologic examination, Dr. John found Plaintiff's motor abilities revealed normal strength and tone and that her gait was within normal limits. *Id.* Dr. John recommended a lumbosacral MRI with treatment to follow symptomatically. (Tr. at 117). At the request of Dr. John, Dr. Douglas Moffat, M.D., performed an MRI of the lumbar spine on April 18, 2001. (Tr. at 123). According to Dr. Moffat, the MRI was unremarkable. *Id.*

On April 27, 2001, Plaintiff presented herself to Dr. Konnappa Murthy, M.D., at the Kell West Regional Hospital for an endoscopic examination of the colon. (Tr. at 118). Plaintiff complained of the passage of large amounts of bright red blood from the rectum on April 6, 2001. *Id.* The passage of blood reportedly continued in small amounts for the next one to two days and eventually stopped. *Id.* Dr. Murthy noted in his report that Plaintiff also complained of back and joint pain related to her below the knee amputation on the right side. (Tr. at 119). Plaintiff weighed

291 pounds at the time of the examination. *Id.* The lab report issued April 30, 2001, revealed a non-malignant rectal polyp. (Tr. at 121).

On May 10, 2002, state agency medical consultant (SAMC) Dr. Moira Dolan, M.D., rendered a technical denial of Plaintiff's disability claim. (Tr. at 194). Dr. Dolan indicated a diagnosis of a ventral hernia and discussed Plaintiff's amputation in the text of her memo. *Id.* Dr. Dolan wrote that there was "insufficient evidence in [the] file" but that Plaintiff's "allegations are partially supported by evidence in file." *Id.* Dr. Bob Dodd, M.D., a second SAMC, reviewed the medical evidence on file and affirmed Dr. Dolan's assessment on June 7, 2002. *Id.*

Plaintiff received a medical check-up by Dr. Moisant on June 17, 2003. (Tr. at 195). Dr. Moisant diagnosed Plaintiff with folliculitis and hidradenitis (inflammation of the sweat gland). *Id.* He encouraged weight loss in order to reduce skin-on-skin contact, reduce colonization, and improve circulation and immune response. *Id.*

On September 3, 2003, Plaintiff presented herself to Dr. Akhtar Hossain complaining of problems related to her artificial leg. (Tr. at 199). At this visit and at visits in October and November of 2003, Dr. Hossain identified folliculitis on the Plaintiff's upper leg and groin. (Tr. at 197–99). Notes of Plaintiff's visit to Dr. Hossain in January 8, 2004, indicate that her folliculitis continued to cause discomfort. (Tr. at 196). During that visit, Dr. Hossain noted that Plaintiff's folliculitis sores had started draining and prescribed Bactrim to alleviate her symptoms. *Id.*

### 3. Hearing Testimony

At a hearing on October 23, 2003, the ALJ heard testimony from Plaintiff and her husband. (Tr. at 221–249). Plaintiff waived her right to be represented by counsel at the hearing. (Tr. at 224).

### a. *Plaintiff's Testimony*

Plaintiff testified that she was 40 years old and had a high school education. (Tr. at 228). Plaintiff had not worked since July 20, 1999, due to folliculitis and a hernia. (Tr. at 229–30). Before the alleged onset of her disability, Plaintiff was employed as a Private Duty Assistant for Solas Health Care Services. (Tr. at 229–30). Plaintiff testified that she was responsible for the care of a child with a stomach tube and typically worked from 8:00 in the morning until about 4:00 in the afternoon. (Tr. at 230, 232). This employment ended in July of 1999 because Plaintiff's employer made other arrangements. (Tr. at 231–32). Plaintiff did not seek new employment because of pain in her amputated leg. (Tr. at 232). According to Plaintiff, she "was getting to where [she] couldn't hardly walk around anyway." *Id.*

The ALJ asked Plaintiff to describe her amputation. (Tr. at 232). Plaintiff testified that her right leg was amputated at age four as the result of a rattle snake bite to her ankle. (Tr. at 243–44). Plaintiff admitted that she had walked to the hearing without a cane, crutch or walker, and is typically able to get around by wearing a prosthesis. (Tr. at 232–33). In addition, Plaintiff testified that prior to claiming disability she worked in a dairy and was very active despite her amputation. (Tr. at 243).

When the ALJ asked Plaintiff how the amputation prevented her from working, Plaintiff explained that she was unable to stand for long periods of time and had a bad callus on the bottom of her leg. (Tr. at 233). Specifically, Plaintiff described that she was unable to stand for more than five minutes doing the dishes. *Id.* Plaintiff also described folliculitis on her leg. *Id.* Despite medication, Plaintiff explained that her leg drained all the time, and her doctors were unable to alleviate this drainage. *Id.* Plaintiff testified that she believed her leg had been infected for a long

time. *Id.* Plaintiff went on to say that she had not had any surgical correction for the callous on her amputated leg and had not been to an orthopedic doctor in the last few years. (Tr. at 234).

The ALJ then asked Plaintiff about her prosthesis. (Tr. at 235). At the time of the trial, Plaintiff had been using her current prosthesis for two years. *Id.* Although the prosthesis fit, Plaintiff testified that her stump would still become swollen and needed to be drained. *Id.* Plaintiff explained that in order for her to be able to walk, the bottom of the prosthesis could not be perfectly fitted to her leg. *Id.* Although Plaintiff would prefer a better fitting prosthesis, she observed that "it just doesn't seem like they can make one that way." *Id.*

Next, the ALJ questioned Plaintiff about her weight. (Tr. at 237). At the time of the hearing Plaintiff weighed 275 pounds and was 5' 8.5" tall. (Tr. at 238). Plaintiff testified that Dr. Masant had suggested she lose 100 pounds. (Tr. at 237). According to Plaintiff, Dr. Masant believed that weight loss might improve the condition of her leg. (Tr. at 238). Plaintiff testified that she was trying to follow the doctor's advice and had considered taking aquatics, as it was a less strenuous form of exercise. *Id.*

The ALJ then inquired about Plaintiff's daily routine. (Tr. at 239). Plaintiff testified that she usually began her day at 7:00 in the morning. *Id.* Plaintiff got her daughter ready for school, put her daughter on the bus, and then typically watched television for a while. *Id.* Plaintiff testified that she often alternated between performing household chores, such as washing the dishes, and sitting down. (Tr. at 239–40). Most of Plaintiff's day was spent sitting down, either reading or watching television. (Tr. at 340). Plaintiff testified that she occasionally suffered from arthritis in her hands. *Id.* Although this somewhat limited her use of her hands, she admitted she was able to dress herself and attend to other matters of her personal grooming. (Tr. at 340–41).

8

Plaintiff also testified that she explored the possibility of vocational rehabilitation but that the person assisting her was extremely unhelpful. (Tr. at 245-47).

    *b.*   *Witness Testimony*

The ALJ instructed Plaintiff's husband, Justin Crouse, to discuss any element of his wife's disability he felt had not been adequately discussed during her testimony. (Tr. at 245). Mr. Crouse testified that his wife's disability had always affected her ability to work; she would work until her leg prevented from working, would rest and heal for a while, and then resume working somewhere else. *Id.*

**C. Summary of ALJ's Findings**

The ALJ issued his decision denying benefits on January 26, 2005. (Tr. at 8–19). The ALJ found that Plaintiff was insured for benefits through March 31, 2000, and had not engaged in substantial gainful activity since the alleged onset of her disability, July 20, 1999. (Tr. at 13, 18). Although the ALJ concluded that Plaintiff's history of a right below-the-knee amputation, a right ventral and umbilical hernia repair, and folliculitis were considered "severe" impairments as defined by the Act, the ALJ did not find these impairments met or equaled the severity criteria of a listed impairment. (Tr. at 13, 16). The ALJ noted that Plaintiff's ability to ambulate effectively after she received her new prosthesis on February 7, 2001, indicated that her impairment did not meet or equal the severity criteria of Listed Impairment 1.02 or 1.05.[3] (Tr. at 16).

Because the ALJ concluded that a determination of disability could not be made on medical evidence alone, the ALJ proceeded to an examination of Plaintiff's residual functional capacity. (Tr.

---

[3]Listed Impairment 1.02 is a major dysfunction of a joint or joints due to any cause. Listed Impairment 1.05 refers to amputation due to any cause. SOCIAL SECURITY ADMINISTRATION, DISABILITY EVALUATION UNDER SOCIAL SECURITY (2005).

9

at 16–17). In his findings, the ALJ noted that Plaintiff's past relevant work included jobs as a farm worker, day-care worker, and primary caregiver. (Tr. at 18). The ALJ also found that Plaintiff was a younger individual, with a high school education and some vocational training, but she had no transferable skills from her past relevant work. (Tr. at 18). Although the ALJ found that it was unclear whether Plaintiff was able to perform her past relevant work, the ALJ found that Plaintiff was capable of performing sedentary type work which "as a rule does not require prolonged standing and walking." (Tr. at 18). Specifically, the ALJ found that there were approximately 200 separate unskilled sedentary occupations that Plaintiff could perform and that each of these occupations represented numerous jobs in the national economy. (Tr. at 19). In addition, the ALJ noted that as a younger individual, Plaintiff had the ability to adjust to other work. *Id.* Finally, the ALJ concluded that Plaintiff's allegations that she was unable to work as a result of her impairments were not fully credible or consistent with the medical evidence. *Id.* As a result, Plaintiff was not disabled within the meaning of the Act.

## II. ANALYSIS

**A.     Legal Standards**

1.      Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-344 (5th Cir. 1988).

    2.    <u>Disability Determination</u>

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issues for Review**

Plaintiff presents the following issues for review:

(1) The ALJ's finding that Ms. Crouse's right leg amputation, singly or in combination with her other severe impairments, did not equal Listing 1.05B or any other Listing during her insured status is not supported by the opinion of a State agency medical consultant or other physician designated by the Commissioner as required by Social Security Ruling 96-6p.

(2) The ALJ failed to apply the appropriate legal standard at Step 2 of the sequential evaluation of disability, established in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), in implicitly ruling that Ms. Crouse's obesity is not a "severe" impairment.

   (a)   Ms.Crouse suffered from morbid obesity during her insured status.

   (b)   The ALJ did not find that Ms. Crouse's obesity is a "severe" impairment.

(c) The ALJ did not apply the appropriate standard of severity in implicitly ruling that Ms. Crouse's obesity is not a "severe" impairment.

(Pl. Br. at 1).

## C. Issue One: Equivalency Opinion on a Listed Impairment

Plaintiff asserts the ALJ erred when he issued his Step 3 finding that Plaintiff's right leg amputation was not equal to Listing 1.05B or any other Listing because he did not seek the opinion of a State agency medical consultant ("SAMC").[4] (Pl. Br. at 9). According to Plaintiff, Social Security Ruling ("SSR") 96-6p requires a SAMC to issue an equivalency opinion on a listed impairment. (Pl. Br. at 13-14). The absence of such an opinion, Plaintiff contends, indicates a lack of substantial evidence and thereby constitutes prejudicial error. *Id.*

### 1. Requirement of SAMC opinion

Social Security Regulation ("SSR") 96-6p was promulgated to clarify the role of SAMCs in determination of disability at the initial and reconsideration phases of the administrative review process. 1996 WL 374180, at *3 (S.S.A. July 2, 1996). The ALJ or Appeals Council is responsible for deciding the ultimate legal question of whether a listing is met or equaled and, as the trier of fact, is not bound by a finding from a SAMC. *Id.* However, according to longstanding policy, the judgment of a SAMC on the issue of equivalence on the evidence must be received into the record as expert opinion evidence and given the appropriate weight. *Id.* The signature of a SAMC on disability determination and transmittal form (SSA-831-U5) or another document on which a SAMC may record findings is sufficient to ensure that consideration by a SAMC has been given to the

---

[4]Listed Impairment 1.05B refers to amputation of "one or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months." SOCIAL SECURITY ADMINISTRATION, DISABILITY EVALUATION UNDER SOCIAL SECURITY (2005).

question of medical equivalence. *Id*.

In the instant case, the SAMCs that considered Plaintiff's disability claim initially and upon reconsideration issued technical denials due to insufficient evidence in the record. (Tr. at 194). Plaintiff asserts that the SAMC did not consider the issue of equivalence because no SAMC completed Form SSA-831-U5. (Pl. Br. at 11-12; Pl. Reply at 9). However, the requirement that a SAMC complete a specific form is too narrow a reading of what constitutes consideration of equivalence. SSR 96-6p clearly provides that "various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion [of equivalence] has been obtained at the first two levels of administrative review." 1996 WL 374180, at *3. The form completed by Dr. Dolan and reviewed by Dr. Dodd contained a summary of complications arising from Plaintiff's amputated leg. (Tr. at 194). Dr. Dolan noted that there was some improvement and that Plaintiff's treating physicians recommended a new prosthesis. *Id*. Nevertheless, Dr. Dolan determined that there was insufficient evidence in the record to determine whether Plaintiff met a listed impairment and issued a technical denial. *Id*. The technical denial was one of five choices provided on the form; the form also provided for: (1) meets a physical listing, (2) equals a physical listing, (3) non-severe impairment, and (4) no significant medical improvement. *See id*. Thus, by providing the SAMC with the opportunity to record her findings and by including equivalence among the five choices, the form completed and signed by Dr. Dolan and reviewed and signed by Dr. Dodd showed that two SAMCs considered the issue of medical equivalence. *See* SSR 96-6p, 1996 WL 374180, at *3.

The underlying assumption of Plaintiff's argument that the SAMC did not issue an equivalence opinion is that there are only two possible outcomes: equivalent and not equivalent.

This argument does not allow for the fact that a technical denial based on insufficient evidence is in itself an opinion by the SAMC on the issue of equivalence. Because Dr. Dolan and Dr. Dodd issued a technical denial, the ALJ *did* have the judgment of a SAMC on the issue of equivalence when he considered the evidence relating to Plaintiff's disability claim. SSR 96-6p, 1996 WL 374180, at *3. The ALJ therefore did not violate the longstanding policy of SSR 96-6p.

### 2. Prejudice

Even if a technical denial does not constitute an opinion by a SAMC on the issue of equivalence, remand in the Fifth Circuit requires a showing of prejudicial error. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected."). Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support the ALJ's decision. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). The record in the case at bar does not support a finding of prejudicial error since both the medical evidence and Plaintiff's own testimony indicate that she can ambulate effectively and thus does not meet Listing 1.05B. *See e.g.* Tr. 146-48, 196-99, 232-33, 239-40.

### 3. Requirement of Updated Expert Opinion

The inquiry into whether the ALJ erred at Step 3 does not end with the determination that the ALJ considered the SAMCs' May 10, 2002, and June 7, 2002 opinions on equivalence. In the instant case, medical records that post-date the SAMCs' technical denial were submitted into the record. (*See* Tr. at 195-99). According to SSR 96-6p, an ALJ must obtain updated expert opinion evidence when, *in the opinion of the ALJ*, additional medical evidence is received that may change

the SAMC's finding that the impairment is not equivalent in severity to any impairment in the Listing of Impairments. 1996 WL 374180 at *3–4; *Brister v. Apfel*, 993 F.Supp. 574, 578 n. 2 (S.D. Tex. 1998) ("It is clear that when additional medical evidence is received that *in the opinion of the ALJ* may change the State agency medical or psychological consultant's findings, an updated medical opinion regarding disability is required.") (emphasis in original). The question before the Court is whether substantial evidence supports the ALJ's opinion that the new medical evidence would not change the SAMC's judgment on equivalence.

After the SAMCs issued their technical denial, the medical record reflects five additional doctors' visits by Plaintiff regarding complications from her amputated leg. On June 17, 2003, Dr. Moisant diagnosed Plaintiff with folliculitis and hidradenitis; he encouraged Plaintiff to lose weight to reduce skin-on-skin contact, reduce colonization, and improve circulation and immune response. (Tr. at 195). From September 3, 2003, to January 8, 2004, Plaintiff saw Dr. Hossain four times for problems related to her artificial leg. (Tr. at 196-99). Dr. Hossain identified discomfort and drainage from the folliculitis sores on her leg and prescribed Bactrin. *Id*. The diagnoses by both Dr. Moisant and Dr. Hossain echoed the earlier diagnosis of Dr. McBroom regarding draining lesions and discomfort associated with Plaintiff's amputated leg; they provide no new information. Additionally, at the administrative hearing, Plaintiff testified that she had walked to the hearing without a cane, crutch or walker, and is typically able to get around by wearing a prosthesis. (Tr. at 232–33). On a typical day, Plaintiff was able to get her daughter ready for school, put her daughter on the bus, and perform household chores, such as washing the dishes. (Tr. at 239–40). Although Plaintiff experienced complications from her prosthesis, her testimony at trial indicates that she was able to ambulate effectively. Thus, based on Plaintiff's testimony and the medical

16

opinions of Dr. Moisant and Dr. Hossein, the Court finds that substantial evidence supports the ALJ's opinion not to seek an updated expert opinion on the issue of equivalence.[5] *Leggett*, 67 F.3d at 564.

## D. Issue Two: Legal Standard of Severity

Plaintiff also contends that the ALJ erred at Step 2 of the sequential evaluation by failing to consider her obesity a severe impairment. (Pl. Br. at 14). In so doing, Plaintiff contends the ALJ rendered a decision unsupported by substantial evidence and based on an erroneous legal standard.

An individual must have an "impairment or combination of impairments which significantly limits [their] physical or mental ability to do basic work activities" for an impairment to be considered severe. 20 C.F.R. § 404.1520(c) (2007). However, in order to prevent the denial of disability benefits to "claimant's who are in fact unable to perform substantial gainful activity," the Fifth Circuit has refined this definition of severity. *Stone v. Heckler*, 752 F.2d 1099, 1103 (5th Cir. 1985). In the Fifth Circuit, an impairment is considered severe unless it is only "a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984). When the disposition of a case is made on the basis of nonseverity, an ALJ must apply the standard set forth in *Stone*. 752 F.2d at

---

[5]Plaintiff cites persuasive authority from the Seventh Circuit to support her contention that the Commissioner committed a prejudicial error. (Pl. Reply at 9) (citing *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (holding an ALJ must consider an expert's opinion on the issue of equivalence)). As stated previously, the ALJ committed no error because he considered the SAMCs' opinion on the issue of equivalence. Moreover, *Barnett* is distinguishable from the case at hand. In *Barnett*, the ALJ not only failed to consult a medical expert concerning equivalence, but also made only a perfunctory discussion of the listing. *Id.* Therefore, the ALJ in *Barnett* erred by assuming the absence of equivalency without any relevant discussion. *Id.* at 670–71. In the instant case, the ALJ considered the SAMCs' technical denial of equivalence, stated the regulatory standard for equivalency, and reviewed relevant elements of the medical evidence in his opinion. *See* Tr. 15–16. The ALJ's discussion of the medical evidence was more than perfunctory and indicates careful consideration of the opinions of Plaintiff's treating physicians. As such, the *Barnett* holding cannot properly be applied to this case.

17

1106.

Moreover, an ALJ must consider a claimant's obesity when determining whether an individual's impairment is severe. SSR 02–1p, 2000 WL 628049, at *3 (S.S.A. Sept. 12, 2002). The standard of severity for obesity is identical to that of other impairments—"obesity is a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *Id.* The Social Security Administration has declined to identify a specific level of weight which indicates a severe or not severe impairment. *Id.* at *4. Instead, an ALJ is required to engage in "an individualized assessment of the impact of obesity on an individual's functioning." *Id.*

In the present case, Plaintiff contends that the ALJ improperly relied on the regulatory standard of severity at Step 2. To support this conclusion, Plaintiff quotes the following passage from the ALJ's decision: "[a]n impairment is severe within the meaning of the regulations if it imposes significant restrictions in the ability to perform basic work activities." (Pl. Br. at 18) (quoting Tr. 13). Plaintiff correctly notes that an ALJ's reliance on this regulatory standard alone is improper. However, in the sentence following that quoted by Plaintiff, the ALJ continued, "[a]n impairment is 'not severe' if it is only a slight abnormality or a combination of slight abnormalities that has no more than a minimal effect on an individual's ability to perform basic work activities." (Tr. at 13). All that the *Stone* court required was that an ALJ either reference the opinion or make an express statement of the standard. *Stone*, 752 F.2d at 1106; *see also Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000) (reiterating that an ALJ must "set forth the standard as it was construed in *Stone*, refer to *Stone* or another decision of this court to the same effect, or expressly state that the

18

construction this court gives to 20 C.F.R. § 404.1520(c) was used"). Consideration of the ALJ's complete articulation of the legal standard for Step 2 reveals that the ALJ set for the standard for severity as it was construed in *Stone*.

Plaintiff also argues that the ALJ's implicit ruling that Plaintiff's obesity was not a severe impairment was not supported by substantial evidence. In his decision, the ALJ identified Plaintiff's right below-the-knee amputation, right ventral and umbilical hernia repair and folliculitis as severe impairments, but did not characterize Plaintiff's obesity as severe. (Tr. at 13). However, the ALJ did make note of Plaintiff's weight in his discussion and also acknowledged that one doctor advised Plaintiff to lose one hundred pounds. (Tr. at 13, 15). Therefore, the ALJ did not ignore the medical evidence of Plaintiff's weight. Instead, by not listing Plaintiff's weight as a severe impairment, the ALJ implicitly determined that her weight both singularly and in combination with her other impairments did not significantly limit her ability to do basic work activities. Therefore the Court can find no error in the ALJ's application of the legal standard at Step 2.

### III. RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the Commissioner be wholly **AFFIRMED** and that Plaintiff's complaint be **DISMISSED**.

**SO RECOMMENDED** on this 30th day of August, 2007.

　　　　　　　　　　　　　　　　　*[signature]*
　　　　　　　　　　　　　　　　　IRMA CARRILLO RAMIREZ
　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

# INSTRUCTIONS FOR SERVICE AND
# NOTICE OF RIGHT TO APPEAL/OBJECT

      Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

                                                  IRMA CARRILLO RAMIREZ
                                                  UNITED STATES MAGISTRATE JUDGE